IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA. FILED BY

CASE NO. 03-20256-CIV-MARTINEZ

03 FEB 26   PM 2:53

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

MOUNT SINAI MEDICAL CENTER OF
GREATER MIAMI, INC., n/k/a MOUNT
SINAI MEDICAL CENTER OF FLORIDA,
INC., a Florida corporation,

      Plaintiff,

vs.

HEIDRICK & STRUGGLES, INC., a
Delaware corporation, and HIEDRICK &
STRUGGLES INTERNATIONAL, INC.,
a Delaware corporation,

      Defendant.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff sues Defendants and says:

### I.

1.     This is an action for damages in excess of $50,000.00.

2.     Heidrick & Struggles, Inc. was a Delaware corporation and was incorporated in that State in 1956.

3.     Heidrick & Struggles International, Inc. is a Delaware corporation and was incorporated in that State in 1968.

4.     In February 1999, Heidrick & Struggles, Inc. changed its name to H & S Transition, Inc. and was merged into Heidrick & Struggles International, Inc.   Its corporate



existence ended.   The surviving entity was Heidrick & Struggles International, Inc., which assumed all of the assets and liabilities of Heidrick & Struggles, Inc.

5.     Prior to the merger, Heidrick & Struggles, Inc. had qualified to do business in Florida and appointed the CT Corporation System as its Resident Agent.   It was Heidrick & Struggles, Inc. prior to the merger that dealt with the Plaintiff and reference to "Heidrick & Struggles" in this Second Amended Complaint is a reference to this corporation.

6.     Subsequent to the merger, Heidrick & Struggles International, Inc. continued to file corporation business reports with the Secretary of State of Florida as "Heidrick & Struggles, Inc." with the CT Corporation System as its Resident Agent.

7.     When this suit was originally filed against Heidrick & Struggles International, Inc., CT Corporation refused to accept service of process as it claimed to be not the Resident Agent of that corporation.

8.     To further compound the confusion, subsequent to the merger, Heidrick & Struggles International, Inc. formed a third Delaware corporation, Heidrick & Struggles, Inc. which has no connection whatsoever with the matters hereinafter alleged in this Second Amended Complaint.

9.     In 1998, Mount Sinai Medical Center accepted the resignation of its Chief Executive Officer.   It sought a new Chief Executive Officer that could deal with the myriad of complex issues inherent in running a major medical center.

10.     In the summer of 1998, members of the Board of Trustees of Mount Sinai contacted Heidrick & Struggles concerning a new Chief Executive Officer.   Heidrick & Struggles claimed to be the world's premier provider of executive level search and leadership. It offered consulting services, representing:

RICHARD L. LAPIDUS
CITY NATIONAL BANK BUILDING, 25 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 • TEL. (305) 577-7279

*Mount Sinai v. Heidrick & Struggles*
Case No. 03-20256 CIV-MARTINEZ

> "We partner with our clients with the objectives to build the best leadership teams in the world by helping them hire, develop and retain the most effective leaders in this industry. . . ."

Its services were described as "identifying, evaluating, and recommending for senior executive level positions" qualified candidates.

11.   Mount Sinai sought a Chief Executive Officer who was honest and had a proven record of successfully running major hospitals which was told to and known by Heidrick & Struggles.

12.   On June 15, 1998, Heidrick & Struggles sent the Chairman of the Board of Trustees of Mount Sinai Medical Center a letter agreement setting out the terms of its representation of Mount Sinai in connection with the search for a qualified Chief Executive Officer.   On July 15, 1998, the agreement was signed and returned to Heidrick & Struggles. The agreement is attached hereto.

13.   By terms of the Agreement, Heidrick & Struggles was retained to act as Mount Sinai Medical Center's agent to research and present qualified candidates for the position of President and Chief Executive Officer.   Implicit in the contract was the obligation of good faith, fair dealing, and commercial reasonableness in Heidrick & Struggles' performance.

14.   The contract detailed that Mount Sinai would be charged for "interviewing expenses", "external communications and research", and "internal research costs".   In addition, the contract indicates that the work would be undertaken by a partner of Heidrick & Struggles, Chris Clark, as well as a research associate, an administrative assistant, and an

RICHARD L. LAPIDUS
CITY NATIONAL BANK BUILDING, 25 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 • TEL. (305) 577-7279

executive from the "Chicago Office". Mount Sinai reasonably expected that in performing the contract Heidrick & Struggles would thoroughly investigate the candidates and present accurate written summaries detailing their background and qualifications.

15. In August of 1998, Heidrick & Struggles sent to Mount Sinai a CONFIDENTIAL EXECUTIVE SUMMARY ON BRUCE PERRY CANDIDATE FOR THE POSITION OF PRESIDENT AND CHIEF EXECUTIVE OFFICER. The SUMMARY was on Heidrick & Struggles' letterhead. It purported to be the result of Heidrick & Struggles extensive research. It was furnished, pursuant to its contract, to induce Mount Sinai Medical Center to employ Bruce Perry as its Chief Executive Officer.

16. The CONFIDENTIAL EXECUTIVE SUMMARY contained material misrepresentations of fact and failed to disclose information material to Mount Sinai's decision on whether to hire Mr. Perry. It contained facts relating to Mr. Perry's service as Chief Executive Officer of both Community Hospitals of Central California and Children's Hospital in Washington, D.C., without disclosing the whole truth regarding his running of those hospitals; including the tremendous financial losses incurred by the hospitals which led to his termination; or his litigation with one of the hospitals.

17. The CONFIDENTIAL EXECUTIVE SUMMARY represented that in Mr. Perry's three years as Chief Executive Officer of the Children's Hospital in Washington, D.C., the hospital was a financial success. In fact, during the years Mr. Perry was President, the hospital lost $37,000,000.

18 The CONFIDENTIAL EXECUTIVE SUMMARY describes Mr. Perry as voluntarily leaving Children's Hospital after the whole Board of Directors failed to renew his contract. In fact, Mr. Perry's contract was not renewed because the hospital was losing

money and because while Mr. Perry was firing personnel, he had opened a personal office for himself in Silver Springs, Maryland, near his home, and he had had the hospital buy him a BMW automobile.

19.    The CONFIDENTIAL EXECUTIVE SUMMARY then goes on to describe Mr. Perry's service as Chief Executive Officer of the Community Hospitals of Central California from 1991 to 1996.   The fiscal year of that hospital ended each year August 31st. Mr. Perry was terminated in October of 1996, after the financial results for fiscal 1996 were released.

20.    Although the CONFIDENTIAL EXECUTIVE SUMMARY seemingly paints a picture of a hospital being run as a financial success, in fact, for fiscal 1996, the last year Mr. Perry served as Chief Executive Officer of Community Hospitals, the hospital had a loss of $17,631,000.00, made up of a $10,834,000.00 loss from operations, and  $6,797,000.00 from re-structuring costs.   Prior to the end of its fiscal year Mr. Perry had assured the board of that hospital that the loss for 1996 would be no more than $2,000,000.  Nowhere in the CONFIDENTIAL EXECUTIVE SUMMARY nor in any of the discussions between the officers of Heidrick & Struggles, Bruce Perry, and Trustees of Mount Sinai Medical Center, were the facts set out or revealed.

21.    The CONFIDENTIAL EXECUTIVE SUMMARY represented that while Mr. Perry was the Chief Executive Officer "the system enjoyed a bond upgrading from BBB+ to A and A-".  In fact, the system's bond rating was lowered from A- to BBB+ because of:

> "Financial performance for full fiscal year 1996 has weakened considerably.   .   .   Absolute cash levels have declined significantly. . . ."

*Mount Sinai v. Heidrick & Struggles*
Case No. 03-20256 CIV-MARTINEZ

22.      The CONFIDENTIAL EXECUTIVE SUMMARY represented:

"He was managing a highly successful diversified delivery system."

In fact, because he had terminated much of the nursing staff of the hospital, unlicensed persons were caring for patients and former employees were picketing the hospital.

23.      In order to picture Mr. Perry as having run a large hospital, the CONFIDENTIAL EXECUTIVE SUMMARY represented that the Community Hospitals of Central California was a 956-bed hospital at the time Mr. Perry was its Chief Executive Officer.  Actually, Community Hospitals of Central California was a 539-bed hospital.  The CONFIDENTIAL EXECUTIVE SUMMARY represented that net revenues for Community Hospitals of Central California for 1996 were $350,000,000.   In fact, the total revenues for 1996 were $214,385,000.

24.      The CONFIDENTIAL EXECUTIVE SUMMARY represented that Mr. Perry's contract was not renewed because the Chairman of the Board of Trustees of the Hospital had disagreed with him in the past and because the Board felt that Mr. Perry, having implemented many new systems, a new person should be brought in to run them.   This fact was false.   Mr. Perry's contract was not renewed because of the enormous losses taken by the hospital in fiscal 1996, because judgments had been obtained against the hospital by physicians groups whose contracts Mr. Perry had terminated and because Mr. Perry had decimated the nursing staff of that hospital.

RICHARD L. LAPIDUS
CITY NATIONAL BANK BUILDING, 25 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 • TEL. (305) 577-7279

25.     Mr. Perry had filed claims against the Hospital for severance pay, which had been arbitrated before a panel of California arbitrators.  The panel found for the Hospital. These facts were omitted.

26.     All of the representations above set forth in the CONFIDENTIAL EXECUTIVE SUMMARY were known to be false by Heidrick & Struggles or were made by Heidrick & Struggles without knowledge of their truth or falsity upon a representation made that they were the result of Heidrick & Struggles own research into the matter.   All of the representations were made with the intent that Mount Sinai Medical Center would rely upon them.   The omitted matters were known to Heidrick & Struggles or should have been known to them.

27.     In reliance upon the representations in the CONFIDENTIAL EXECUTIVE SUMMARY, Bruce Perry was hired as the Chief Executive Officer of Mount Sinai Medical Center in December of 1998.   Heidrick & Struggles was paid $169,000.00 in fees for finding Mr. Perry, researching his job experience and education, and presenting him to the Hospital.

28.     Mr. Perry, upon being hired as the Chief Executive Officer of Mount Sinai Medical Center, hired Heidrick & Struggles to fill various positions in the Hospital and caused the Hospital to pay hundreds and hundreds of thousands of dollars in fees to Heidrick & Struggles for their efforts.

29.     In 1999, Mount Sinai incurred losses which were expected, as Mr. Perry seemingly sought to correct the problems incurred in the past and cut down on what was perceived by Mr. Perry to be an inflated staff of employees.   The Business Office, which had charge of billings, was drastically downsized.   Year end 2000 reflected a much lower loss because of the cuts effected by Mr. Perry.

RICHARD L. LAPIDUS
CITY NATIONAL BANK BUILDING, 25 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 • TEL. (305) 577-7279

30.    In January of 2001, Mr. Perry and Harvey Smith, the Chief Operating Officer who had been hired by Mr. Perry through Heidrick & Struggles, presented to the Executive Committee of Mount Sinai Medical Centre a budget for 2001 which reflected that the Medical Center should expect a net profit of $3,500,000.    Mr. Perry had budgeted the expenses of the Hospital based upon  expected income from claimed renegotiations with the Hospital's major insurance payors.  Most of those insurance contracts were not renegotiated, but the monthly statements presented to the Board reflected this claimed "renegotiation". During the first five months of 2001, Mr. Perry and Mr. Smith presented to the Executive Committee financial statements of the Hospital reflecting either a small loss or small profit each month.    By June of 2001, however, it became apparent that the Hospital would be running out of money and further, that the Business Office, whose staff had been cut by Mr. Perry in order to lower the expenses of the previous year, had ceased to operate.    The Hospital was forced to bring in as consultants, its outside accountants Deloitte & Touche, to operate the Business Office.    In the summer of 2001, Deloitte & Touche  reported to the Executive Committee of the Hospital that enormous losses had been incurred during the first six months of operation, losses not reflected in any of the financial statements given to the Board by Mr. Perry and Mr. Smith.  Mount Sinai paid to Deloitte & Touche fees for their consulting service in running Mount Sinai's Business Office and in determining why the Hospital was running out of money.

31.    Bruce M. Perry was formally terminated as Chief Executive Officer of Mount Sinai Medical Center on October 8, 2001.  For the complete year 2001, Mount Sinai Medical Center lost $64,800,000 in operations.   The loss was occasioned by the incompetence of Mr. Perry and his staff, many of whom had been hired through the efforts of Heidrick &

Struggles, and Mr. Perry's complete inability to run a Hospital the size of Mount Sinai Medical Center.

32.     Heidrick & Struggles breached its contract with the Plaintiff in that it failed to investigate Mr. Perry's background or, in the alternative, having investigated the background and knowing of his past failures deliberately omitted them from the CONFIDENTIAL EXECUTIVE SUMMARY.   Heidrick & Struggles was motivated solely by its intent to earn fees not only for the placement of Mr. Perry, but, upon Mr. Perry becoming Chief Executive Officer of the Plaintiff, fees for placing other executives in Mount Sinai.

33.     Plaintiff's extraordinary losses in 2001, the fees it paid to Deloite & Touche and the excessive fees paid to Heidrick & Struggles, including fees paid placing in Mount Sinai friends of Mr. Perry, were plainly foreseeable and the direct result of Heidrick & Struggles' breach of contract and breach of its duty of good faith, fair dealing, and commercial reasonableness.


II.

34.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 31 as if here set forth.

35.     In reliance upon Heidrick & Struggles' representations, as above set forth, Mount Sinai retained them to search for, identify, evaluate, and recommend to them a qualified candidate for Chief Executive Officer of the Hospital.

36.     `Based upon the fraudulent representations of Heidrick & Struggles as to Bruce Perry's work experience and qualifications, Mount Sinai was induced to hire Mr. Perry as its CEO.

37.    The extraordinary losses incurred by Mount Sinai in 2001, were plainly foreseeable in light of Mr. Perry's past experiences and were proximately caused by his misrepresentations as to the earnings of the Hospital, misrepresentations similar to ones he had made to previous employers.  The fees paid to Heidrick & Struggles were damages also proximately caused by Heidrick & Struggles firm.

38.    In order to understand why the Hospital had suffered such an enormous loss in 2001, Mount Sinai, upon Mr. Perry's termination, contacted previous hospitals in which he had worked.  It was then that it discovered that the representations made in the resume of Bruce Perry, prepared by Heidrick & Struggles, were, as above set forth, false.   That, in fact, the hospitals he had run had incurred enormous losses and that he had previously misrepresented operating figures to hospital boards.

III.

39.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 31 as if here set forth.

40.    Mount Sinai was invited to and, in fact, did establish a fiduciary relationship with Heidrick & Struggles relying on their claimed expertise and the research and investigative skills of their staff to search out the background of the candidates presented.

41.    Heidrick & Struggles  breached its fiduciary obligation to the Plaintiff by misrepresenting the qualifications of Bruce Perry to operate the Mount Sinai Medical Center. The extraordinary losses incurred in 2001 during Mr. Perry's term as Chief Executive Officer of Mount Sinai Medical Center were a direct and proximate result of this breach of fiduciary obligation.

RICHARD L. LAPIDUS
CITY NATIONAL BANK BUILDING, 25 WEST FLAGLER STREET, MIAMI, FLORIDA 33130 • TEL. (305) 577-7279

*Mount Sinai v. Heidrick & Struggles*
Case No. 03-20256 CIV-MARTINEZ

WHEREFORE, being injured, Plaintiff demands damages.

LAW OFFICE OF RICHARD L. LAPIDUS
Attorney for Plaintiff
711 City National Bank Building
25 West Flagler Street
Miami, Florida 33130
(305)577-7279
(305)577-7205 (Facsimile)

By _____
RICHARD L. LAPIDUS
FLORIDA BAR NO. 045460


I HEREBY CERTIFY that a true copy of the foregoing was mailed to DAVID A. COULSON, ESQUIRE, Morgan Lewis & Bockius LLP, Counsel for Defendant, 5300 Wachovia Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131-2339 this _____day of  February, 2003.

By _____
RICHARD L. LAPIDUS


11

# HEIDRICK & STRUGGLES

Consultants in Executive Search

June 15, 1998

Received

JUL 20 1998

Administration

PERSONAL AND CONFIDENTIAL

Mr. Leonard L. Abess
President & CEO
City National Bank of Florida
25 W. Flagler Street, 6th Floor
Miami, FL 33130

Dear Mr. Abess:

Thank you for retaining us to assist in the identification and selection of your President and Chief Executive Officer for Mt. Sinai Medical Center in Miami, FL. It will be our responsibility to present candidates to you for your final decision.

After I complete the interviews with all of the interested parties, we will publish the draft specification and submit it to you for any changes you feel are desirable. The final specification will be distributed within our organization so our entire recruiting staff will be aware of the assignment.

As you know, we work on a retainer arrangement by project. Our fee is one-third of the total first year's estimated annual cash compensation for each candidate. With regard to compensation for billing purposes, we have assumed an annual compensation of $455,000 (an estimated salary of $350,000 and an estimated likely and available bonus of 30 percent or $105,000). We will invoice our retainer fee of $151,667 as follows: June 16, 1998, $25,278; July 31, 1998, $25,278; August 31, 1998, $50,556; and September 30, 1998, $50,556. Expenses, which are invoiced monthly, include direct out-of-pocket expenses incurred on your behalf plus certain allocated costs relating to each search assignment. Direct expenses include travel, sourcing and interviewing expenses, courier, and external communications and research, as well as related costs incurred by the candidates and our personnel relating to this assignment. Allocated costs include charges for internal research costs (except external database charges), report production, internal data/network communications, photocopying, fax, and data processing. Allocable expenses are 10 percent of the retainer over the first four invoices up to $10,000. All subsequent invoices will have an additional allocable expense of $100 as long as the search is open and other expenses are being billed.

When this assignment is completed and annual compensation is determined, we will reconcile our fee and send our final invoice. Payment of our fee and expenses is not contingent upon the hiring of one of our candidates.

It is our practice to begin work upon receipt of your written acknowledgment of this letter, approval of the position specification, and your approval for payment of our first invoice.

It is hoped that the search can be completed before the end of the billing period. Should this not occur, we will continue the search without an additional fee for up to six months from the start of the search, charging only expenses. In the unlikely event that the search is not successfully completed three months following the final billing, we may suggest a reevaluation of the project to determine how the search should proceed.

One Peachtree Center  Suite 3100  303 Peachtree Street  Atlanta, GA 30308  Phone: 404/577-2410  FAX: 404/577-4048

Heidrick & Struggles, Inc.  Offices in Principal Cities of the World

Mr. Leonard L. Abess, President & CEO                    -2-                    June 15, 1998

If this project is canceled within the first three months, we will charge only for the pro rata portion of the fee, plus expenses up to the date the notice of cancellation is received. If it should become necessary to cancel the search after the three-month period, the full retainer will be considered earned.

As part of our client relationship, it is our policy not to recruit executive level employees from a "client" for a specified period of time. We will not recruit employees of Mt. Sinai Medical Center, in Miami, FL, from the date of this letter, for one year, unless an exception applies. Exceptions to this policy include instances where a client ceases to exist, authorizes an exception, violates this agreement, or has a significant change in ownership with our relationship ending; and client executives who, with the client's knowledge, are seeking other employment opportunities, or who, prior to the date of this letter, were in the process of being recruited. If an outside candidate presented by Heidrick & Struggles is employed by Mt. Sinai Medical Center and asked to resign or is discharged by Mr. Sinai Medical Center within one year of employment for a reason other than one known to Mt. Sinai at the time of his/her employment, then Heidrick & Struggles will do a new search for no additional retainer fee, charging only for allocable and reimbursable expenses.

It is our practice to assign two individuals to each search effort. Kenneth L. Rattner of our Chicago office will be working with me and will be co-responsible throughout the search. You should feel free to contact Ken at 312/496-1787 if you cannot reach me. Also, my Research Associate, Joan Schlachter, or Administrative Assistant, Pam Adley, will be pleased to assist you with any questions you may have. If you have any suggestions or comments at any time, we would be happy to have them.

Sincerely,

Chris Clark
Partner

WCC/pa
cc:   Ken Rattner


ACKNOWLEDGMENT

Please acknowledge your receipt and acceptance of this letter by signing and returning the enclosed copy to me.

_____
Signature

_Chairman of the Board  Mt. Sinai_
Title

_July 15, 1998_
Date